UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MENTAL DISABILITY LAW CLINIC,
TOURO LAW CENTER,

                Plaintiff,

-against-                     **MEMORANDUM AND ORDER**
                                       Case No. 96-CV-1485 (FB)
MICHAEL F. HOGAN, in his official
capacity as Commissioner of the New York
State Office of Mental Health,

                Defendant.
-----------------------------------------------------------x

*Appearances*:
*For the Plaintiff*:                             *For the Defendant*:
WILLIAM M. BROOKS, ESQ.             ERIC T. SCHNEIDERMAN, ESQ.
Jacob D. Fuchsberg Law Center         Attorney General of the State of New York
Touro College                                   By JANE R. GOLDBERG, ESQ.
225 Eastview Drive                           Assistant Attorney General
Central Islip, NY 11722                     120 Broadway, 24th Floor
                                                          New York, NY 10271

**BLOCK, Senior District Judge:**

        This case is on remand from the Second Circuit. The circuit court's remand revives the claim of the Mental Disability Law Clinic, Touro Law Center ("the Clinic"), that certain practices of the New York State Office of Mental Health ("OHM") violate the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. In addition to addressing the merits of the Clinic's claims, OMH (through its commissioner, Michael F. Hogan) has moved for summary judgment on the grounds (1) that the Clinic lacks standing, and (2) that its claims are barred by the doctrine of collateral estoppel. The Clinic, for its part, asks the Court to recertify the class it decertified in connection with its

prior dismissal of the Clinic's claims. Finally, Edward Davison, a current OMH patient, seeks leave to intervene as a plaintiff.

For the following reasons, the Court concludes that the Clinic has individual standing to pursue its claims, and that OMH has waived the argument that the claims are barred by collateral estoppel. On the merits, however, its holds that OMH's practices do not violate either the First Amendment or the Equal Protection Clause.

I

The relevant facts are taken from the existing record, as supplemented by the parties' respective Rule 56.1 statements and their stipulation dated March 28, 2007. They are undisputed.

OMH is charged with providing care and treatment to the state's mentally ill population. *See* N.Y. Mental Hyg. Law § 7.07. By statute, it must "charge fees for its services to patients and residents." *Id.* § 43.01(a). To ensure, however, that services are made available to the indigent, OMH's Commissioner is authorized to "reduce or waive fees in cases of inability to pay." *Id.* § 43.03(a). Accordingly, OMH does not calculate or assess care and treatment charges if it believes that the patient will not be able to pay them. It may rethink that decision if the patient's financial picture improves because of some new source of income. How OMC proceeds when the potential source of income is a lawsuit against it in the New York Court of Claims is the subject of this case.[1]

---

[1] "The Court of Claims has exclusive jurisdiction over actions for money damages against State agencies, departments, and employees acting in their official capacity in the exercise of governmental functions." *Dinerman v. NYS Lottery*, 870 N.Y.S.2d 792, 792 (2d Dep't 2009). OMH's response to suits in other courts (such as New York Supreme

2

## A. Pre-*Acevedo* Practices

Prior to 1992, OMH would respond to a suit by an indigent patient or indigent former patient by sending a verified claim for the full amount of his or her unpaid charges. If the patient pursued the suit and prevailed, OMH would assert the claim as a lien or offset against the judgment. Since OMH's claim was not formally asserted as a counterclaim in the patient's suit, the only means of challenging the validity of the claim was to bring a separate proceeding (either a declaratory judgment action or an Article 78 proceeding) in New York Supreme Court.

Two patients, represented by the Clinic's lead attorney, challenged the practice in federal court. In *Acevedo v. Surles*, 778 F. Supp. 179 (S.D.N.Y. 1991), Judge Ward of the Southern District upheld the challenge on three grounds. First, he held that sending a verified claim to a suing patient violated the First Amendment because it chilled the assertion of claims against OMH by vitiating the monetary incentive to pursue the claim and threatening the patient with out-of-pocket liability in cases where the amount due exceeded the amount of the patient's claim. *See id.* at 183-185. Second, he held that the same practice violated the Equal Protection Clause of the Fourteenth Amendment because it singled out certain patients for different treatment with the "intent to inhibit or punish the exercise of constitutional rights." *Id.* at 186 (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). Third, he held that asserting a lien or offset to reduce a judgment against OMH violated the Due Process Clause of Fourteenth Amendment because the

---

Court or federal court) is not dictated by any formal policy or practice.

3

practice did not allow for a predeprivation opportunity to challenge OMH's claim. *See id.* at 187-89.

At the conclusion of his opinion, Judge Ward noted that "[t]he filing of a counterclaim is but one mechanism that the State could use to provide a constitutionally valid predeprivation hearing." *Id.* at 189. He further noted that OMH's assessment practice could not be viewed as a good-faith effort to recover a valid debt based on a change in the patient's financial condition because its assessment was always for the full amount of charges due, without regard to whether the charges exceeded the amount sought by the patient. *See id.* at 190 ("The current practice of filing verified claims for amounts far exceeding the amount of the underlying claims for damages against the State can only be viewed as an effort at retaliation against those who sue the State."). Ultimately, he approved a post-judgment stipulation clarifying that his decision did not prohibit OMH from asserting a counterclaim limited to the amount recovered by the patient, but also did not preclude a subsequent challenge to such a policy.

**B. Post-*Accvedo* Practices**

In 1992, OMH changed its practices in response to *Acevedo*; those practices remain in effect today. It continues to calculate an assessment of all charges due when it is sued by a patient. Instead of informing the patient of the full assessment, however, it authorizes its attorneys to file a counterclaim for the charges, but only up to the amount of the patient's claim. If, after investigation, OMH believes a patient's claim has merit, it will attempt to negotiate a settlement. Such a settlement almost always includes a waiver of *all* charges due, even those exceeding the amount of the counterclaim. Thus, OMH will

4

pursue the counterclaim only if the case proceeds to trial (either because OMH has decided not to pursue settlement negotiations or because those negotiations have failed). Even in cases that proceed to trial, OMH's current practice could not result in an affirmative money judgment against the patient.

Four OMH patients, again represented by the Clinic's lead attorney, challenged the revised practice in New York Supreme Court.[2] In *Siegel v. Surles*, Case No. 405319/93 (N.Y. Sup. Ct., N.Y. County Jul. 10, 1995), Justice Lebedeff "appl[ied] the same constitutional principles set forth in *Acevedo*," but concluded that the revisions had cured all of the constitutional problems with the original practice. The Appellate Division affirmed "for the reasons stated by [Justice Lebedeff]," *Siegel v. Surles*, 657 N.Y.S.2d 549, 549 (2d Dep't 1997), and the Court of Appeals declined review, 91 N.Y.2d 804 (N.Y. 1997) (table).

OMH made a refinement to the practices approved in *Siegel* in 1999. It will not even begin the assessment and counterclaim process in cases involving allegations of rape, sexual abuse or severe physical abuse unless settlement negotiations have failed. In addition, it will never assert a counterclaim in a case involving the death of a patient. The effect, if any, of these exceptions on the practice's constitutionality was not addressed in either *Acevedo* or *Siegel*.

## C. The Present Action

While *Siegel* was pending in the Appellate Division, two other OMH patients

---

[2]The patients simultaneously sought to challenge the revised practice by asking Judge Ward to reopen *Avecedo*. He declined.

and the estate of a third filed suit in this Court. Plaintiff Jed Rothstein alleged that he had settled a lawsuit against OMH officials for less than he would have when OMH informed him that it intended to file a suit against him to recover $24,760.14 in care and treatment charges. Plaintiff Limoni Brown, the administrator of the estate of Evelyn Hassan, alleged that he had considered dropping a suit against OMH and a suit against OMH officials after counterclaims for the cost of his decedent's care and treatment were asserted in both cases. Plaintiff Brian DeMarco alleged that he had filed a federal lawsuit against OMH physicians, but did not allege that OMH had ever billed or threatened to sue him for the cost of his care and treatment.

The three individual plaintiffs were represented by the Clinic's lead attorney. In addition, the Clinic was named as a plaintiff. It alleged both that it was a protection and advocacy ("P&A") agency entitled, by statute, to pursue legal remedies on behalf of mentally ill individuals; and that it had itself suffered an injury. In support of the latter claim, it alleged that OMH's counterclaim practice "effectively insulated" it from "most civil liability," which, in turn, led to "[p]ervasive and systemic violations" of its patients' rights, which, in turn, required the Clinic to devote more of its "limited resources" than it otherwise would have done to litigation to vindicate those rights; this, in turn, "diminish[ed] the ability of the Clinic to provide services to other individuals who require assistance." Fourth Am. Compl., ¶¶ 107-13.

All plaintiffs sought declarations that OMH's current practices violated the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, as well

6

as injunctions prohibiting OMH from attempting to recover care and treatment charges from any award obtained by patients or former patients in lawsuits against it or its employees. In addition, Rothstein sought damages from the individual OMH officials he claimed were responsible for assessing the charges against him.

The Court addressed the defendants' motions to dismiss in a decision dated August 17, 1999. *See Brown v. Stone*, 66 F. Supp. 2d 412 (E.D.N.Y. 1999). Although the Court expounded at length on the issues presented, its pertinent holdings can be briefly summarized. First, it held that "DeMarco lacked standing, but that the Clinic had standing "in both its representational and individual capacities." *Id*. at 443. Second, it held that "[p]rinciples of *res judicata* and collateral estoppel would not interfere with such a determination [on the merits] since the parties have stipulated that it is one of the issues which they wish the Court to decide in this litigation." *Id.* at 428. Finally, it held that New York law did not allow contingent counterclaims such as those asserted by OMH against patients in the Court of Claims. *See id.* at 427-33.

The Court's third holding obviated the need to address the constitutionality of OMH's counterclaim practice. It did not, however, moot the challenges to the assessment practice. On that issue, the Court denied the motion to dismiss the First Amendment challenge because Rothstein and Brown had

> sufficiently alleged that (1) "[they have] an interest protected by the First Amendment"; (2) "the defendant[s]' actions were motivated by or caused by the plaintiff[s]' exercise of that right"; and (3) "the defendant[s]' action[s] effectively chilled the exercise of plaintiff[s]' First Amendment rights."

*Id.* at 436 (quoting *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir. 1998)). It denied the motion

7

to dismiss the Equal Protection challenge because Rothstein and Brown had adequately (though implicitly) alleged that patients who might obtain other types of assets that could be used to pay their care and treatment charges were treated differently. *See id.* at 437.

Brown and Rothstein subsequently moved for summary judgment on their First Amendment claims. Reciting the elements set forth in its 1999 decision, the Court concluded as a matter of law that the plaintiffs had "an interest protected by the First Amendment," but that the remaining two elements raised questions of fact. *See* Tr. of Jun. 19, 2003 at 5-6 (quoting *Brown*, 66 F. Supp. 2d at 435-36). Accordingly, the motion was denied.

Rothstein subsequently settled his claim for $7,000. Brown, meanwhile, had settled his state-court action for $130,000 plus a waiver of OMH's counterclaim. With all claims now resolved, the Court entered a judgment dismissing the action.

The Clinic—and only the Clinic—appealed. By summary order, the circuit court first addressed "two preliminary matters." It

1. affirmed that the Clinic had associational and individual standing "based on the allegations in the complaint," but did so without prejudice to OMH's right to challenge, by motion for summary judgment, standing "based on the facts in the record"; and

2. affirmed that OMH had waived the defense of *res judicata,* first by stipulating that the constitutionality of the counterclaim policy was at issue, and then by failing to raise the defense in their answer (which was filed after the Court's 1999 decision).

*Mental Disability Law Clinic, Touro Law Ctr. v. Carpinello*, 189 F. App'x 5, 7 (2d Cir. 2006). It also affirmed, "for substantially the reasons stated by the district court," the denial of Rothstein and Brown's motion for summary judgment. *Id.* at 8.

8

On the central issue, however, the circuit court reversed and remanded. Citing a then-recent case from the New York Court of Appeals, it held that "a patient's ability to pay is not a condition precedent to a claim for recovery of medical expenses by the state." *Id.* (citing *State v. Patricia II*, 6 N.Y.3d 160, 162, 164 (2006)). Thus, state law did not provide a means of avoiding the federal constitutional issues.

## II

The circuit court's remand, coupled with the parties' post-remand submissions, frame the following issues for the Court's determination.

**A. Standing**

*1. Associational Standing*

The Clinic has reduced its claim that it has standing through the mentally-ill population it serves to an argument to be preserved for appeal. To be preserved, however, an issue must be "pressed or passed upon below." *United States v. Harrell*, 268 F.3d 141, 146 (2d Cir. 2001) (quoting *United States v. Williams*, 504 U.S. 36, 41 (1992)). Thus, the Court will address it.

The Clinic's reluctance to rely on associational standing is based on *Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011), which reaffirmed that "[i]t is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983, as we have 'interpret[ed] the rights [§ 1983] secures to be personal to those purportedly injured.'" *Id.* at 156 (quoting *League of Women Voters v. Nassau County Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984)). It is not clear whether that rule applies when, as here, Congress has expressly removed the prudential barrier to assertion of a

9

third party's rights by a P&A agency.

Even if Congress can allow P&A agencies to assert § 1983 claims on behalf of others, such an agency must— as a constitutional prerequisite—establish that one or more of its "members" would have standing if they sued in their own right. *See New York Civil Liberties Union v. New York City Transit Auth.*, ___ F.3d ___, 2012 WL 10972, at *6 (2d Cir. Jan. 4, 2012). Some have argued that P&A agencies can *never* satisfy that requirement because they do not have participatory "members," as that term is usually understood in the associational standing context. The Second Circuit recently heard argument on that question in *Disability Advocates, Inc. v. Paterson*, Case No. 10-251.

The Court need not wait for the Second Circuit's decision in *Disability Advocates* because even if P&A agencies can theoretically assert the standing of their "members," the Clinic has failed to do so here. The only evidence of member standing before the Court is the affidavit of Frank Davison, the brother of putative intervenor Edward Davison. He states that he has recommended "that Edward discontinue his lawsuit against the State if a court permitted the State to assess care and treatment charges against patients who sued the State of New York," and that "Edward has stated he agrees with this assessment." Aff. of Frank Davison (May 19, 2011) ¶¶10-11. What Frank would advise, however, is not the same thing as what Edward would do, and Frank's claim that Edward would follow his advice is hearsay.

**2. *Individual Standing***

The Clinic need not rely on associational standing if it can show it "suffered a concrete injury" in its own right. *New York Civil Liberties Union*, ___ F.3d ___, 2012 WL

10

10972, at *7; *see also Nnebe*, 644 F.3d at 156 ("[N]othing prevents an organization from bringing a § 1983 suit on its own behalf so long as it can independently satisfy the requirements of Article III standing...."). With respect to individual standing, the Clinic's theory is that OMH's practices cause it to devote more resources than it otherwise would to challenging the practices.

Some circuits have disapproved the theory that "litigation expenses alone . . . constitute damage sufficient to support standing." *Fair Housing Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 78-79 (3d Cir. 1998); *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990). The Second Circuit, however, continues to adhere to the view that a "perceptible impairment" of an organization's economic situation will suffice, *see Nnebe*, 644 F.3d at 157 (quoting *Regin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993), even if "the proximate cause of that economic injury is 'the organization's noneconomic interest in encouraging [a particular policy preference].'" *Id.* (quoting, with alteration, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.20 (1982)). Indeed, the circuit court approved the Clinic's theory in its 1999 summary order, leaving the Court to determine only whether the theory was supported by the facts on a motion for summary judgment.

In that regard, the Clinic's lead attorney has submitted an affidavit that he has spent roughly 600 hours on *Acevedo*, *Siegel* and this case. Although, as OMH points out, that figure works out to very little on a weekly basis, it is nevertheless a "perceptible" amount and, therefore, sufficient to establish the Clinic's individual standing. *Cf. Nnebe*, 644 F.3d at 157 ("Even if only a few suspended drivers are counseled by [the organizational

11

plaintiff] in a year, there is some perceptible opportunity cost expended by the [plaintiff] . . . .").

**B. Collateral Estoppel**

OMH asks the Court to reconsider its 1999 holding that OMH waived the defenses of *res judicata* and collateral estoppel. By virtue of the Second Circuit's affirmance, that holding is now the law of the case. In any event, OMH has not convinced the Court that its prior holding was incorrect.

**C. The Merits: First Amendment**

The parties and every court to have addressed the Clinic's First Amendment claim (i.e., Judge Ward in *Acevedo*, the New York courts in *Siegel*, and the Court in its prior decisions in this case) have all invoked the three-element formulation for First Amendment retaliation claims: (1) a First Amendment interest (conceded here), (2) an action "motivated by or substantially caused" by the exercise of that interest, and (3) an actual chilling effect on the exercise of the interest. In *Acevedo*, Judge Ward concluded that the second element was established as a matter of law because OMH undisputedly assessed charges in response to the plaintiff's filing of a suit against it.

Judge Ward, however, did not have the benefit of *Greenwich Citizens Committee v. Counties of Warren & Washington Industrial Development Agency*, 77 F.3d 26 (2d Cir. 1996). There, the Second Circuit held that "at least for a claim of a First Amendment violation arising in the context of litigation, a governmental entity alleged to have chilled a litigant's freedom of speech by filing counterclaims in response to a complaint must be shown to have acted with retaliatory intent." *Id.* at 30. It reasoned that "cases arise when

12

the plaintiff's protected conduct is a unitary event that could prompt either a permissible or an impermissible reason on the part of the defendant to act, or possibly both reasons." *Id.* at 33. Such cases "require focusing precisely on whether the defendant acted for an impermissible reason, and not merely in response to the plaintiff's conduct." *Id.*

Thus, plaintiffs must "persuade the jury that the counterclaims were filed, not as a legitimate response to litigation, but as a form of retaliation, with the purpose of deterring the exercise of First Amendment freedom." *Id.* at 31. To punish an entity just for filing a counterclaim "would subject that entity to strict liability under section 1983," which would run afoul of the Supreme Court's pronouncement that "the existence of a 'chilling effect,' even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action." *Id.* at 30 (quoting *Younger v. Harris*, 401 U.S. 37, 51 (1971)).

The Second Circuit was careful to note that "[t]here is a crucial distinction between retaliatory First Amendment claims and affirmative First Amendment claims (e.g., facial challenges to statutes, challenges to prior restraints) . . . . Although a showing of retaliatory intent is required for a retaliatory First Amendment claim, it appears not to be required for most affirmative First Amendment claims." *Greenwich Citizens Comm.*, 77 F.3d at 31-32.

Although the Clinic broadly challenges OMH's practices—as opposed to any individual application of them—the Court is of the opinion that the challenge is a retaliatory First Amendment claim and, therefore, that *Greenwich Citizens Committee* controls. The import of that case is that a counterclaim may be asserted for a legitimate

13

purpose, an illegitimate purpose, or both; and that the motivation is of constitutional significance. That significance is conceptually the same whether the decision to assert a counterclaim is made in individual cases or pursuant to a generally applicable policy.

In sum, the Court holds that the Clinic must establish that OMH's policy is motivated, at least in part, by a desire to retaliate against those who exercise their First Amendment right to sue it. In that regard, the Court has given the Clinic an opportunity to identify evidence in the rather voluminous record that might create an issue of fact as to OMH's motivations. The Clinic's response was a *non sequitur*:

> After a thorough review of (1) all documents set forth in the plaintiff's 2002 summary judgment motion, which serve as the basis of the authority set forth in the letter brief to this Court dated August 15, 2007, and (2) all governing legal authority as set forth in the plaintiff's memorandum of law submitted in opposition [to] the defendant's summary judgment motion last year, as well as the August 15, 2007 letter brief, the plaintiff believes that enough uncontroverted facts exist as to warrant the granting of summary judgment [for plaintiff] in the absence of a trial.

Letter of William M. Brooks (Mar. 9, 2012).

Notwithstanding the Clinic's unhelpful response, the Court has carefully examined the record. It finds no evidence that OMH's current practices are motivated by retaliatory animus.

**D. The Merits: Equal Protection**

Although the First Amendment is the focus of Clinic's challenge, it also argues that similarly situated patients are treated differently, in violation of the Equal Protection Clause. The parties both characterize the appropriate comparators as patients

14

and former patients who might come into money through a suit in the Court of Claims, and patients and former patients who might come into money in other ways. The Court agrees that this is the apt comparison.

Of course, different treatment of similarly situated groups does not, standing alone, violate the Equal Protection Clause. Plaintiffs must also prove either "selective prosecution"— that is, that the "differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person," *Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)—or discrimination against a "class of one" with "no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

As the Second Circuit has recognized, claims of selective prosecution based on the exercise of fundamental rights—like those enshrined in the First Amendment—"coalesce" the claims for violations of the rights. *See Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) (quoting *African Trade & Info. Ctr. v. Abromatis*, 294 F.3d 355, 363 (2d Cir. 2002)). Since, for the reasons stated above, there is no evidence that OMH's practices are motivated by a desire to retaliate against patients' exercise of their fundamental right to sue, a selection-prosecution claim based on that right must fail as well. *See id.* ("Our holding on the First Amendment retaliation claim that the evidence in this case was insufficient . . . requires that we direct entry of judgment for the defendants on the plaintiffs' selective prosecution claim as well.").

The only remaining issue is whether there is a rational basis for OMH to

pursue different collection practices depending on whether the debtor is suing it in the Court of Claims. With respect to the counterclaim practice, it is true that OMH does not attempt to collect an assessment against, say, a Social Security applicant until benefits are actually awarded. The same is presumably true for a patient who inherits money, wins the lottery or recovers in a lawsuit not involving OMH. There is a perfectly rational reason to treat such patients differently because there is no opportunity for OMH to intervene in a Social Security proceeding, or private lawsuit, or probate proceeding, or anything else to which is it not a party.

With respect to the assessment practice, it is not clear from the record whether OMH assesses charges differently based on whether the patient is suing it or not. What is clear is that no patient is made aware of the assessment until it is asserted as a counterclaim. Thus, the assessment policy visits no harm on a patient independent of the counterclaim policy, which, for the reasons just stated, passes constitutional muster.

**E. Class Recertification and Intervention**

Given the Court's disposition of the Clinic's claims, the Clinic cannot represent the interests of all indigent patients—past, present and future—who have or will have claims against OMH; accordingly, the Court will not recertify that class. Similarly, allowing Edward Davison to intervene in the litigation at this point would serve no purpose.

### III

OMH's motion for summary judgment is granted. The Clinic's motion for class recertification and Edward Davison's motion to intervene are denied. Any other

16

pending motions are denied as moot, and the Clerk is directed to close the case.

**SO ORDERED.**

s/ Judge Frederic Block
_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
March 30, 2012